Corey B. Beck
Nevada Bar No. 5870
LAW OFFICE OF COREY B. BECK P.C.
425 South Sixth Street
Las Vegas, Nevada 89101
Telephone: (702) 678-1999
Email: becklegal@yahoo.com
*Attorneys for Debtor, Acton Academy Red Rock LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>ACTON ACADEMY RED ROCK LLC,<br><br>Debtor. | Case No.: 26-13991-mkn<br>Chapter 11<br><br>**DEBTOR'S MOTION TO EXTEND THE TIME WITHIN WHICH TO ASSUME OR REJECT AN UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(d)(4)**<br><br>Hearing Date:<br>Hearing Time: |

Acton Academy Red Rock LLC, the debtor and debtor in possession in the above-captioned Chapter 11 case (the "**Debtor**"), by and through its counsel, LAW OFFICE OF COREY B. BECK P.C., hereby moves (the "**Motion**") pursuant to 11 U.S.C. § 365(d)(4)(B)(i) for entry of an order extending, by ninety (90) days, the time within which the Debtor must assume or reject its unexpired lease of nonresidential real property with The MTN Church and Precedent Properties, LLC. The Motion is made and based upon the following Memorandum of Points and Authorities, the Declaration of Amy Novak (the "**Declaration**") filed concurrently herewith, the pleadings and papers on file in this case, of which the Debtor requests the Court take judicial notice, and any argument the Court may entertain at the hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION AND VENUE

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested is 11

U.S.C. § 365(d)(4), together with Rules 6006, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court for the District of Nevada (the "**Local Rules**").

## II. STATEMENT OF FACTS

### A. The Chapter 11 Case.

On June 26, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. As of the date of this Motion, no trustee or examiner has been appointed, and no official committee of unsecured creditors has been appointed. The Debtor has not elected to proceed under Subchapter V of Chapter 11.

The Debtor operates a private school that currently has 58 students in 4multi-age studios. in the Red Rock area of Las Vegas, Nevada from the premises described below.

### B. The Lease.

The Debtor is the lessee under a written lease dated September 11, 2025 (the "**Lease**") for premises located at 9501 Hillwood Drive, Las Vegas, NV 89134 (the "**Premises**"). The lessor under the Lease is [The MTN Church and Precedent Properties, LLC] (together, the "**Landlord**"). The Lease is an unexpired lease of nonresidential real property. – See Exhibit 1, Copy of Lease

The Premises are essential to the Debtor's operations. Sudden move can make it challenging for student and parents alike and it will disrupt learning.

### C. The Section 365(d)(4) Deadline.

Under 11 U.S.C. § 365(d)(4)(A), an unexpired lease of nonresidential real property under which the debtor is the lessee is deemed rejected, and the debtor must immediately surrender the premises to the lessor, if the debtor has not assumed or rejected the lease by the earlier of (i) 120 days after the date of the order for relief or (ii) the date of entry of an order confirming a plan. The 120-day period will expire on October 24, 2026 The Debtor has not previously sought an

extension of this deadline. This Motion is therefore timely, having been filed before the expiration of the 120-day period.

**D. The Disputes with the Landlord.**

*The Landlord's claim and the disputed arrears.* The Landlord is asserting a claim in the amount of $126,473.25, which includes alleged pre-petition lease arrears. The Debtor disputes the Landlord Claim, including the amount of the alleged arrears, and has filed an objection to the Landlord Claim [ECF No. 38] (the "**Claim Objection**"), which is set for hearing on October 28, 2026. Objection to Claim is seeking setoff (reduction in amount owed) of $595/Sunday x 4= $2,975/month. The loss of use for 10 months equals $29,750.00. The Mountain Church has restricted 1,284 sq. ft of open/shared space and restricted use of balcony. Debtor has sought $40,000.00 in offset (reduction) for restriction on standard use of space.

*The Landlord's limitation of the Debtor's use of space.* The Mountain Church has restricted 1,284 sq. ft of open/shared space and use of balcony. Similarly, Landlord has restricted use of space on Sundays for the last 10-months. Debtor would utilize Sundays for parent outreach, community development, staff meetings, tutoring, and open houses. The Debtor disputes that the Landlord is entitled to restrict the Debtor's use of the Premises in this manner.

On August 13, 2026 the Landlord filed a Motion for Relief from the Automatic Stay [ECF No. 24] (the "**Stay Relief Motion**"), seeking relief from stay based on non-payment and seeks to commence/continue eviction of Debtor. The Debtor has opposed the Stay Relief Motion [ECF No. 38], and the matter is set for hearing on October 7,2026.

The Claim Objection, the dispute over the Debtor's use of space at the Premises, and the Stay Relief Motion (collectively, the "**Landlord Disputes**") are pending and unresolved.

## III. LEGAL STANDARD

Section 365(d)(4)(B)(i) of the Bankruptcy Code provides that the court may extend the 120-day period "for 90 days on the motion of the trustee or lessor for cause." 11 U.S.C. § 365(d)(4)(B)(i). Any further extension requires "the prior written consent of the lessor in each instance." 11 U.S.C. § 365(d)(4)(B)(ii). The Bankruptcy Code does not define "cause," and the determination lies within the Court's discretion. Courts have considered factors such as whether

the lease is the debtor's primary asset or is central to its business or reorganization; whether the lessor continues to receive the rent and other performance to which it is entitled under the lease during the post-petition period; whether the debtor's continued occupancy is damaging the lessor beyond the compensation available under the Bankruptcy Code; whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in terms of the formulation of a plan; and whether the case is complex. *See, e.g.*, *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105–06 (2d Cir. 1982). A motion seeking an extension must be made, and the Court must act, before the 120-day period expires.

The purpose of the extension is to give the debtor a reasonable opportunity to determine whether the lease is beneficial to the estate before it must make the decision to assume or reject.

## IV. ARGUMENT

### A. Cause Exists Because the Landlord Disputes Must Be Resolved Before the Debtor Can Make an Informed Decision.

Objection to Landlord's Claim is set for October 28, 2026. Resolution of Landlord's Claim is important and necessary in regard to decision to assume or reject lease. This fully supports Motion to Extend. Debtor will have more information as to amount of funds and tendering of payment soon. Debtor is learning how many students will be enrolling for next year. Debtor will be able to project income from students enrolling for the next school year soon. Debtor will continue to tender toward arrears owed at the beginning of next year. – See Exhibit 2 Declaration of Amy Novak, paragraph 8.

The Lease is central to the Debtor's business and to any plan of reorganization. If the Lease is deemed rejected, the Debtor will be required to surrender the Premises immediately, which would effectively end the Debtor's ability to reorganize. The decision whether to assume the Lease cannot responsibly be made, however, until the Landlord Disputes are resolved.

First, assumption of the Lease would require the Debtor to cure, or provide adequate assurance of prompt cure of, any default under the Lease. 11 U.S.C. § 365(b)(1)(A). The Debtor disputes the alleged arrears, and the amount of any cure cannot be determined until the Court

rules on the Claim Objection. The Debtor cannot evaluate whether assumption is economically feasible without knowing the cure amount.

Second, the Landlord has limited the space available to the Debtor at the Premises. The scope of the premises the Debtor would be assuming, and the corresponding value of the Lease to the estate, are therefore also in dispute. Assuming the Lease before that dispute is resolved risks the Debtor being bound to pay for space that it is not permitted to use.

Third, the Landlord's Stay Relief Motion, if granted, could determine whether the Debtor remains in possession of the Premises at all, and would render any decision to assume the Lease moot. It would be wasteful of the Debtor's and the Court's resources for the Debtor to be required to decide whether to assume or reject before the Court has ruled on that motion.

**B. The Landlord Will Not Be Prejudiced.**

The Landlord will not be prejudiced by a ninety-day extension. Debtor is tendering post-petition rent payments. Because the Debtor is timely performing, the Landlord continues to receive the benefit of its bargain during the extension period. The Landlord's remedies with respect to any post-petition default are also preserved, and the Landlord's pending Stay Relief Motion is set for hearing and will be decided on its merits.

**C. The Debtor Has Acted Diligently and the Extension Requested Is Limited.**

The Debtor has acted diligently in addressing the Landlord Disputes: it promptly filed the Claim Objection and opposed the Stay Relief Motion, and each is set for hearing. The requested extension is the maximum period permitted by 11 U.S.C. § 365(d)(4)(B)(i) without the Landlord's consent, and it is tied directly to the time reasonably needed to resolve the Landlord Disputes. The requested extension is made without prejudice to the Debtor's right to seek a further extension with the Landlord's prior written consent under 11 U.S.C. § 365(d)(4)(B)(ii), and without prejudice to the Debtor's rights and defenses with respect to the Claim Objection, the Stay Relief Motion, and the Landlord's restriction of the Debtor's use of the Premises.

**D. The Debtor Requests Hearing on Shortened Time, If Necessary.**

Because the 120-day period under 11 U.S.C. § 365(d)(4)(A) will expire on October 24, 2026, the Debtor requests that this Motion be heard on shortened time, and will separately submit an application for an order shortening time in accordance with the Local Rules.

## V. CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order: (1) granting the Motion; (2) extending, pursuant to 11 U.S.C. § 365(d)(4)(B)(i), the time within which the Debtor must assume or reject the Lease by ninety (90) days, from October 24, 2026 through and including January 22, 2027 (3) providing that the Lease shall not be deemed rejected during the extension period; (4) providing that the extension is without prejudice to the Debtor's right to seek a further extension with the Landlord's written consent and to the parties' respective rights with respect to the Claim Objection and the Stay Relief Motion; and (5) granting such other and further relief as the Court deems just and proper.

DATED this 29 day of Septem, 2026.

Respectfully submitted,

**LAW OFFICE OF COREY B. BECK P.C.**

By: /s/ ____________
Corey B. Beck
Nevada Bar No. 5870
425 South Sixth Street
Las Vegas, Nevada 89101
Telephone: (702) 678-1999
Email: becklegal@yahoo.com
*Attorneys for Debtor*

# EXHIBIT 1

# 9501 HILLWOOD PROFESSIONAL CENTER

## LOCATION

9501 Hillwood Drive
Las Vegas, NV 89134
Suite #300

## LANDLORD

80% THE MNTN CHURCH &
20% PRECEDENT PROPERTIES, LLC

## TENANT

ACTON ACADEMY RED ROCK, LLC
Nevada Limited Liability Co.

## LEASE COMMENCEMENT

September 11, 2025

## RENT START DATE

September 11, 2025

## PREMISE

Suite #300
Totaling approximately +/- 7,667 rentable Sq. Ft.
(Suite 300 +/- 6,383 sq ft + 31.32% of the Open and shared space +/-1,284 sq ft)
Plus, exclusive use of the Upstairs Balcony ( +/- 697 sq ft) and exclusive use of the base level +/- 816 sq ft playground area with ECHO Therapy tenants.
**See Floorplan Exhibit A for the floorplan layout reference

## BASE RENT

YEAR 1: $16,100.70
YEAR 2: $16,583.72
YEAR 3: $17,081.23

YEAR 4: $17,593.67
YEAR 5: $18,121.48

**See Base Rent Payment Schedule in Exhibit C for reference
3% annual rent increases

## OPERATING EXPENSES

Year 1 estimated $0.55 cents per RSF= $4,193.77 per month

## SECURITY DEPOSIT

Total Security deposit to be $16,000.00
*Due upon signing*

## TERM

5 Years (60 Months)

## PARKING

Shared parking in the Center
Tenant to receive 4 Covered Parking spots and to be finally identified between the parties

## LEASE GUARENTY

This Lease to be guaranteed by ACTON Academy Red Rock, LLC and is further guaranteed by Amy Novak as the Personal Guaranty.

## ADDITIONAL ITEMS

1. Any construction or improvements must be approved and signed off by the Landlord prior to any plans and permits.
2. Any and all demo, improvements and construction to be performed by an authorized State of Nevada General Contractor and all work must be Permitted through the governing authorities.

## TOTAL DUE UPON LEASE COMMENCEMENT

1. $16,000.00 Security Deposit
2. $10,197.11 September prorate Rent (19 days)
3. $2,656.05 September prorate CAM'S (19 days)

# NNN - OFFICE LEASE

1. ***Fundamental Lease Terms.***

1.1 ***Lease Date.*** September 11, 2025

1.2 ***Parties.*** *Landlord:* The MNTN Church, a non-profit & Precedent Properties, LLC, Nevada Limited Liability Co.

*Tenant:* Acton Academy Red Rock, LLC, Nevada Limited Liability Co.

1.3 ***Building.*** 9501 Hillwood Drive Las Vegas, NV 89134, which contains approximately 24,472 square feet of Medical & professional office space.

1.4 ***Demised Premises and Common Areas.***

*i.* *Demised Premises:* Suite #300 of the building, shown as Exhibit A.

*ii.* *Square Feet:* Approximately +/-7,667 rentable square feet / RSF.

1.5 ***Commencement Date.*** September 11, 2025

1.6 ***Term.*** FIVE years (60 months), expiring September 30, 2030

1.7 ***Security Deposit.*** The Security Deposit ($16,000.00) shall be delivered to Landlord concurrently with the execution of the lease. Total due at lease signing is **$16,000.00** (Security Deposit) and **$10,197.11** (1st months prorate share rent) & **$2,656.05** (CAM reimbursements amount).

1.8 ***Monthly Base Rents***: ***See Base Rant payment schedule Exhibit C***

1.9 ***CAM's & Operating Expenses***: Tenan to be responsible to pay for **31.36%** of building CAMS & Operating expenses. Based on 2024/2025 prior owner records, the Operating Expenses are estimated to start at fifty-five ($0.55) cents per square foot for the 1st year and are subject to increase or decrease per section 8.0 through 8.3.

1.10 ***Tenant Improvements***. Tennant may improve or renovate the space but only with Owner permission, approval and written consent from the Owner prior to any work be done

1.11 ***Tenant's Use.*** Offices will be used for private school

1.12 ***Other.*** Capitalized terms used in this Lease shall have those meanings ascribed to them in this Article 1 or elsewhere in this Lease.

2. ***Parties***. This Lease is made and entered into by and between Landlord and Tenant on the Lease Date.

3. ***Demise of Premises***. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Demised Premises (sometimes referred to as the "*Premises*") in the Building for the Term and upon the conditions and agreements set forth. The Demised Premises are located as specified in Section 1.4.

4. ***Term***. The Term of this Lease shall commence on the Commencement Date and shall continue in full force and effect throughout the Term provided for in Section 1.6 hereinabove. Notwithstanding anything to the contrary, "*Commencement Date*" means the date Landlord makes the Premises available for occupancy by Tenant, which is expected to be the date set forth in Section 1.5 hereinabove. As used in this Lease, "*Lease Year*" means each 365 consecutive day periods throughout the Term, beginning on the Commencement Date and each anniversary thereof.

5. ***Delivery of Possession of Demised Premises***. Landlord has delivered possession of the Demised Premises to Tenant concurrently with the mutual execution and delivery hereof. Tenant hereby accepts the Demised Premises AS IS, WITH ALL FAULTS. If Tenant so desires, Tenant can construct tenant improvements and Tenant shall be solely responsible to construct and pay for all tenant improvements in the Demised Premises; provided, however, that it shall only do so pursuant to plans and specifications approved by Landlord and utilizing contractors and procedures approved by Landlord, in all cases in its sole and absolute discretion. Tenant shall indemnify, defend, and hold harmless Landlord with respect to all such activities and ensure that no lien is placed against the Building in connection therewith.

6. ***Security Deposit***. The Security Deposit shall be held by Landlord as security for the payment of the rent reserved and the faithful performance by Tenant of all of the terms, conditions, and covenants herein to be performed by Tenant, as well as to

indemnify Landlord in part for costs and expenses which Landlord may suffer by reason of any default by Tenant. If Tenant then shall have performed fully all of the terms, conditions, and covenants to be performed by Tenant hereunder, Landlord shall return to Tenant the Security Deposit, without interest, within thirty (30) days of the termination of this Lease.

7. ***Base Rental.*** Tenant hereby agrees to pay during the Term the Base Rent. The Base Rent, together with any adjustment of rent provided for herein then in effect (including, but not limited to, the adjustments described in Section 1 and 8), shall be due and payable in twelve (12) equal installments on the first day of each calendar month during the Term of this Lease and any extensions or renewals thereof, and Tenant hereby agrees to so pay such rent to Landlord at Landlord's address as provided herein (or at such other address as may be designated in writing by Landlord from time to time), monthly, in advance and without demand, counterclaim, or set-off. If the Term of this Lease as heretofore described commences on other than the first day of a calendar month or terminates on other than the last day of a calendar month, then the installments of Base Rent for such month or months shall be prorated and the installment or the installments so prorated shall be paid in advance. In the event that any installment or installments of any rental or other payments due hereunder are not made by the fifth (5th) day of the month, or within five (5) days of any other greed upon due date. Tenant shall, in addition to the payment of such sums and all other sums due hereunder, be required to pay the Landlord (i) an administrative fee equal to ten percent (10%) of the late amount and (ii) interest upon such late amounts at the rate of 18% annum. Tenant agrees to pay during the Term of this Lease the respective annual Base Rent as set forth in Section 1.8 hereinabove.

8. ***Landlord CAM'S & Operating Expenses***. During each month of the Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to **31.36%** of the annual cost, as estimated by Landlord from time to time, of Tenant's Proportionate Share of Operating Expenses (defined below) for the Building. Payments thereof for any fractional calendar month shall be prorated. At the time of signing this Lease, the Tenant's share of Operating Expenses are estimated to start at $0.55 per sq. foot of the Premises per month ("Tenant's Share of Operating Expenses"). Within thirty (30) days of the end of each calendar year during the Term, Landlord shall provide a true and accurate report of the previous year's Operating Expenses and Tenant's Proportionate Share of Operating Expenses. If Tenant paid more than Tenant's Proportionate Share of Operating Expenses for the prior year, then Landlord shall issue a refund to Tenant for such excess paid, or, at the election of Tenant, Landlord may apply any excess paid to any amount owed by Tenant for the following year. If Tenant paid less than Tenant's Proportionate Share of Operating Expenses for the prior year, then Tenant shall pay the difference between that paid and that owed to Landlord within thirty (30) days of Tenant's receipt of said report. Operating Expenses as used herein, shall mean all electricity consumption in connection with the use of the buildings common areas, the exterior building maintenance and common area cleaning, bathrooms, Real Estate taxes, Real

Estate/Building insurance, the roof, structure, foundations, and common area A/C units and all other related building expenses & maintenance.

8.1 ***Actual Operating Expenses.*** As used herein, the term "*Actual Operating Expenses*" means all actual costs and expenses of operation and maintenance of the Building, grounds, and parking area, as determined by standard accounting practices, and includes the following cost by way of illustration but not limitation: utilities, wages and salaries of on-site personnel, personal property taxes (except those payable by the Tenant under the provisions of the Lease), real property taxes and other similar assessments, insurance premiums and deductibles, licenses, permit and inspection fees, management, legal, and accounting fees, normal building and parking area repairs, garbage and waste disposal expenses, janitorial labor, materials, and supplies, and heating and air conditioning costs, expenses, and repairs. The term "*Actual Operating Expenses,*" as used herein, does not include depreciation of the Building or equipment, interest upon indebtedness of Landlord, leasing commissions, or capital expenditures except for such capital expenditures that result in reductions in the Actual Operating Expenses; provided, however, that Tenant acknowledges that this Lease is intended to be an "*absolute-net*" lease, such that all expenses of the Building, grounds, and parking area are a part of the Actual Operating Expenses.

8.2 ***Tenant's Share of Actual Operating Expenses***. As used herein, the term "*Tenant's Share of Actual Operating Expenses*" means Tenant's Proportionate Share (as set forth in Section 1.9 hereof) of Actual Operating Expenses for the period in question.

8.3 ***Annual Adjustments to Payments of Tenant's Share of Actual Operating Expenses***. If Tenant's Share of Actual Operating Expenses for any year is greater than the projected amount theretofore paid by Tenant for such year, Tenant shall pay to Landlord with Tenant's next regular monthly rental payment after Tenant's receipt of such statement, the amount of such excess. However, if Tenant's Share of Actual Operating Expenses for such year is less than the projected amount theretofore paid by Tenant for such year, Landlord shall pay to Tenant within thirty (30) days after Tenant's receipt of such statement the amount of such overpayment. Any sums payable by Tenant hereunder shall be deemed additional rent.

9. ***Intentionally Omitted***

10. ***Intentionally Omitted***

11. ***Use of Premises***. Tenant shall use and occupy the Premises only in strict accordance with the following:

11.1 ***Tenant's Use***. Tenant shall use and occupy the Premises exclusively for Tenant's use set forth in Section 1.11 hereof and for no other purposes. Tenant use shall include private schooling.

11.2 ***Use to Comply with Applicable Rules.*** Tenant shall not use or occupy the Premises in violation of law or of the Certificate of Use or Occupancy issued for the Building of which the Premises are a part, and shall immediately discontinue any use of the Premises which is declared either by any governmental authority having jurisdiction or by the Landlord to be a violation of any law, code, or regulation, or a violation of said Certificate of Use or Occupancy.

11.3 ***Use Restrictions Related to Fire and Safety.*** Tenant shall not do nor permit anything to be done which will invalidate or increase the cost of any fire and extended coverage insurance policy covering the building and/or property located therein, and shall comply with all rules, orders, regulations, and requirements of the appropriate Fire Rating Bureau or any other organization performing a similar function. Tenant shall promptly upon demand reimburse Landlord for any additional premium charged for such policy by reason of Tenant's failure to comply with provisions of the Paragraph.

11.4 ***Use Restrictions Relating to Rights of Other Parties.*** Tenant shall not do nor permit anything to be done in, on, or about the Premises which would in any way obstruct or interfere with the rights of other tenants or occupants of the Building, or use or allow the Premises to be used for any immoral, unlawful, or objectionable purpose, nor shall Tenant maintain or permit any nuisance or commit or suffer to be committed any waste in, on, or about the Premises.

11.5 ***Intentionally Omitted.***

11.6 ***Use Restrictions Relating to Hazardous Substances.*** Tenant shall not cause or permit the release or disposal of any hazardous substances, waste, or materials, or any medical, special, or infectious wastes, on or about the Premises or the Building of which they are a part. Hazardous substances, wastes, or materials shall include those which are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1988, as amended, 41 USC Section 9601 et. seq.; the Toxic Substances Control Act, as amended, 15 USC Section 2601 et. seq. Tenant shall comply with all rules and policies set by Landlord, the HOA (Tenant has previously received a copy of the CC&R's) and with all federal, state, and local laws, regulations, and ordinances including those which govern the use, storage, handling, and disposal of hazardous substances, wastes, or materials and medical, special, or infectious wastes. Tenant

shall indemnify, defend, and hold Landlord harmless from and against any claims or liability arising out of or connected with Tenant's failure to comply with the terms of this Section, which terms shall survive the termination of this

Lease.

11.7 ***Landlord's Special Remedies Relating to Use Violations***. Landlord may, at its option and in addition of all its other remedies hereunder or at law or in equity, terminate this Lease in the event that Tenant engages in a prohibited use and fails to cure such violation within thirty (30) days following Tenant's receipt of written notice from Landlord. Notwithstanding the foregoing, in the event Tenant promptly commences and continues to pursue cure of such violation but is unable to complete such cure within thirty (30) days, Landlord shall provide Tenant with a reasonable time to cure the same.

12. ***Building Services.*** Landlord shall furnish the following Building services: all electricity to the common areas, exterior building maintenance and common area cleaning, to include RE taxes, RE insurance, maintenance on the roof, maintenance, A/C systems to the common areas and repair of Building structure and foundations, common area Bathrooms, and key fob security locks on all building entrances to be locked after business hours.

12.1 ***Utilities***. All utilities for the common areas of the building and common area maintenance services will be paid for by Landlord. Landlord reserves the privilege of stopping any or all of such services in case of accident or breakdown, or for the purpose of making alterations, repairs, or improvements, and shall not be liable for the failure to furnish or delay in furnishing any or all of such services when same is caused by or is the result of strikes, labor disputes, labor, fuel, or material scarcity, or government or other lawful regulations or requirements, or for the failure of any corporation, firm, or person with whom Landlord may contract for any such service, or for any service incident thereto, to furnish same, or due to any cause other than the gross negligence of the Landlord; and the failure to furnish any of such services in such event shall not be deemed or construed as an eviction or relieve Tenant from the performance of any of the obligations imposed upon Tenant by this Lease. Landlord shall not be responsible to Tenant for loss of property in or from the Premises, or for any damage done to furniture, furnishings, or effects therein, however occurring, except where such damages occur through the gross negligence of Landlord; nor shall Landlord be responsible should any equipment or machinery break down or for any cause cease to function properly on account of any such interruption of service. Tenant shall be solely responsible for and shall promptly pay all charges for telephone and other communication service. Notwithstanding the foregoing, in the event there is an interruption of services lasting more than five (5) consecutive days and such interruption is within the control of Landlord, then Tenant shall receive abatement of rent from the day such interruption occurred until the day such services are restored.

12.2 ***Exterior Maintenance of Building***. Landlord will maintain the exterior of the building.

13. ***Alterations***. Tenant may not make any changes, additions, alterations, improvements, or additions to the Premises or attach or affix any articles thereto without Landlord's prior written consent. All alterations, additions, or improvements which may be made upon the Premises by Landlord or Tenant (except unattached trade fixtures and office furniture and equipment owned by Tenant) shall not be removed by Tenant but shall become and remain the property of Landlord. All alterations, improvements, or additions to the Premises (as permitted by Landlord) shall be done only by contractors or mechanics approved by Landlord and shall be performed at Tenant's sole expense and at such times and in such manners as Landlord shall designate. If Tenant shall make any alterations, improvements, or additions to the Premises, Landlord may require Tenant, at the expiration of this Lease, to restore the Premise to substantially the same condition (normal wear and tear excepted) as existed at the commencement of the Term. Any mechanics' or materialmen's liens for which Landlord has received a notice of intent to file or which have been filed against the Premises or the Building arising out of work done for, or materials furnished to Tenant, shall be discharged, bonded over, or otherwise satisfied by Tenant within ten (10) days following the earlier of the date Landlord receives (i) notice of intent to file a lien or (ii) notice that the lien has been filed. If Tenant fails to discharge, bond over, or otherwise satisfy any such lien within the first ten (10) day period following receipt by Tenant notice (which such notice is received from Landlord or otherwise) of intent to file a lien or that a lien has been filed, Landlord may do so at Tenant's expense, and the amount expended by Landlord, including reasonable attorney fees, shall be paid by Tenant within ten (10) days following Tenant's receipt of a bill therefore from Landlord.

14. ***Damage to Property; Injury to Persons***.

14.1 ***Indemnification***. The following provisions shall apply with respect to damage to property, injury to persons, and such other matters specified therein. Tenant and Landlord shall and hereby does indemnify and hold the other harmless from and against any and all claims arising from: (i) The other's use of Premises or the conduct of the other's business or profession; (ii) any activity, work, or thing done, permitted, or suffered by the other in or about the Premises; (iii) any breach or default in the performance of any obligation on the other's part to be performed under the terms of this Lease; or (iv) any negligent acts or omissions of the other or of the other agents or employees. Tenant & Landlord shall and hereby does further indemnify, defend, and hold the other harmless from and against all costs, attorney fees, expenses, and liabilities incurred in connection with any such claim or any action or proceeding brought thereon. In case any action or proceeding is brought against the other by reason of any such claim, Tenant & Landlord upon notice from the other, shall defend same at the other's expense by counsel reasonably satisfactory to the Party being

indemnified. Landlord Indemnifies Tenant from any and all damages related to the actions of Landlord.

14.2 ***Liability for Damages to Property and Injuries to Persons***. Tenant, as a material part of the consideration of Landlord, hereby assumes all risk of damage to property or injury to persons in, upon, or about the Premises from any cause other than Landlord's negligence, as proven by binding arbitration pursuant to the standards of the American Arbitration Association.

14.3 ***Insurance***. During the Term, Tenant shall maintain comprehensive general liability insurance on the Premises of at least $2,000,000 for personal and bodily injury per occurrence and $500,000 for property damage. As evidence thereof, on or before the Commencement Date, Tenant shall provide to Landlord Certificates of Insurance evidencing such coverage during the Term, and naming Landlord as an "Additional Insured". Tenant shall also maintain *"All Risk"* property insurance on all property owned or used by Tenant in the Premises, including, without limitation, all Tenant improvements.

14.4 ***Restrictions on Liability of Landlord***. Neither Landlord nor its agents shall be liable for any damage to property entrusted to employees of the Building, nor for loss of or damage to any property by theft or otherwise, nor from any injury or damage to persons or parties resulting in fire, explosion, falling plaster, steam, gas, electricity, water, or rain which may leak from any part of the Building or from the pipes, appliances, or plumbing works therein or from the roof, street, or subsurface, or from any other place or resulting from dampness or any other cause whatsoever, unless caused by or due to the negligence of Landlord, its agents, servants, or employees, as proven by binding arbitration, pursuant to the standards of the American Arbitration Association. Neither Landlord nor its agents shall be liable for any latent defect in the Premises or in the Building. Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or in the Building or of defects therein or in the fixtures or equipment.

15. ***Assignment and Subletting***. Tenant shall not sublease or sublet any of this space without the full and written approval and consent from the Landlord. The consent by Landlord to an assignment or subletting shall not be construed as (i) relieving Tenant from obtaining the express written consent of Landlord to any further assignment or subletting; or (ii) releasing Tenant from its primary liability under the Lease. Notwithstanding the foregoing, Tenant shall not be required to obtain Landlord consent for an assignment or sublease to a subsidiary of Tenant.

16. ***Damage or Destruction***. If the Premises are damaged by fire or other casualty (collectively *"Casualty"*) not caused by Tenant, the damage shall be repaired by and at the expense of Landlord, provided such repairs can, in Landlord's

opinion, be made within sixty (60) days after the occurrence of such Casualty without the payment of overtime or other premiums. If Tenant, its employees, invitees, or patients approximately caused such damage, then Tenant shall be responsible to pay the cost to repair such damage. Until such repairs are completed, the Rent shall be abated in proportion to the part of the Premises which is unusable by Tenant in the conduct of Tenant's business. However, there shall be no abatement of Rent by the reason of any portion of the Premises being unusable for a period equal to one day or less, or if the Casualty is due to the negligent acts or omissions of Tenant or Tenant's employees. If such repairs cannot, in Landlord's opinion, be made within one hundred eighty (180) days or Landlord elects not to repair the Premises, then either party may, by written notice to the other, cancel this Lease as of the date of the Casualty without penalty. Landlord election to make such repairs must be evidenced by written notice to Tenant within thirty (30) days after the occurrence of the damage. If Landlord fails to make such election within this time period, Landlord shall be deemed to have elected not to repair the Premises, and either party may, by written notice to the other, cancel this Lease as of the date of the Casualty without penalty. A total destruction of the Building in which the Premises are located shall automatically terminate the Lease.

17. ***Eminent Domain***. If the whole of the Premises or so much thereof as to render the balance unusable by Tenant shall be taken under power of eminent domain, this Lease shall automatically terminate as of the date of such condemnation, together with any and all rights of Tenant existing or hereafter arising into the same or any part thereof; provided, however, that nothing herein shall be deemed to give Landlord any interest in or require Tenant to assign to Landlord any award made to the Tenant for: (i) the taking of personal property and fixtures belonging to Tenant; (ii) the interruption of or damage to Tenant's business or profession; (iii) the cost of relocation expenses incurred by Tenant; and (iv) the unamortized cost of leasehold improvements paid for by Tenant. In the event of a partial taking which does not result in the termination of the Lease, the Rent shall be apportioned according to the part of the Premises remaining useable by Tenant. Landlord may without any obligation or liability to Tenant stipulate with any condemning authority for a judgment of condemnation without the necessity of a formal suit or judgment of condemnation, on the date of taking under this Section shall then be deemed the date agreed to under terms of said agreement or stipulation.

18. ***Defaults***. The occurrence of any of the following shall constitute a material default and breach of the Lease: (i) the vacating or abandonment of the Premises by Tenant; (ii) a failure by Tenant to punctually pay the Rent or to make any other payment required to be made by Tenant hereunder when due; (iii) a failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant; (iv) the making by Tenant of any general assignment for the benefit of creditors; (v) the filing by or against Tenant of a petition to have Tenant adjudged bankrupt or the filing of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); (vi) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in

this Lease, where possession is not restored to Tenant within thirty (30) days. Tenant shall not be in default in the performance of any obligation provided for herein, except with reference to the payment of Rent, unless and until Tenant has failed to perform such obligation within thirty (30) days after written notice by Landlord to Tenant specifying wherein Tenant has failed to perform such obligation provided, however, that if the nature of Tenant's obligation is deemed to be in default if Tenant shall commence such performance within such thirty (30) days and thereafter diligently prosecute the same to completion. Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by it hereunder unless and until it has failed to perform such obligation within thirty (30) days after written notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is deemed to be in default if Landlord shall commence such performance within such thirty (30) days and thereafter diligently prosecute the same to completion.

19. ***Landlord's Remedies***. In the event Tenant commits an act of default as set forth hereinabove, Landlord may exercise one or more of the following described remedies, in addition to all other rights and remedies available to it elsewhere hereunder, at law, or in equity, whether or not stated in this Lease:

19.1 ***Continuation of Lease;*** *Reletting of Premises, Etc.* Landlord can continue this Lease in full force and effect and shall have the right to collect Rent when due. During the period Tenant is in default, Landlord can re-enter the Premises with or without legal process and relet them, or any part of them, to third parties for Tenant's account, and Tenant hereby expressly waives any and all claims for damages by reason of such re-entry, as well as any and all claims or damages by reason of any distress warrants or proceedings by way of sequestration which Landlord may employ to recover said rents. Tenant shall be liable immediately to Landlord for all cost Landlord incurs in reletting the Premises, including, without limitation brokers' commissions, reasonable expenses of refurbishing or remodeling the Premises reasonably required or any such reletting, and like costs. Reletting can be for a period shorter or longer than the remaining Term of this Lease, and in no event shall Landlord be under any obligation to relet the Premises, however, Landlord must take any and all reasonable actions necessary to mitigate Landlord's damages hereunder. On the date such rent is due, Tenant shall pay to the Landlord a sum equal to the Rent due under this Lease, less the rent Landlord receives from any reletting. No act by Landlord allowed by this Paragraph shall terminate the Lease unless Landlord elects to terminate the Lease.

19.2 ***Late Fees***. Landlord can demand and collect any and all late fees and interest charges due under the terms of this Lease.

19.3 ***Tenant's Remedies***. Upon a default by Landlord under the terms of the Lease,

Tenant shall have available to it any and all remedies allowable by Nevada law.

19.4 ***Remedies Generally***. Should any of these remedies, or any portion thereof, not be permitted by laws of the State of Nevada, then such remedy or portion thereof shall be considered deleted and unenforceable, and the remaining remedies or portions thereof shall be and remain in full force and effect, and the Parties may avail themselves of these as well as any other remedies or damages allowed by law. All the rights, options, and remedies of the Parties stated herein or elsewhere by law or in equity shall be deemed cumulative and not exclusive of one another.

20. ***Landlord's Lien***. In addition to any available statutory Landlord Lien, Landlord shall have at all times, a valid security interest to secure payment of all rentals, additional rental, and other sums of money becoming due hereunder from Tenant, and to secure payment of any damages or losses which Landlord may suffer by reason of the breach by Tenant of any covenant, term, or provision of this Lease. Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirements of reasonable notice shall be met if such notice is given in the manner prescribed in this Lease at least five (5) days before the time of any foreclosure sale in the event Landlord has elected to exercise the power of sale. The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding, and selling of the property (including reasonable attorney fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Section. Any surplus shall be paid to Tenant or as otherwise required by law and Tenant shall pay any deficiencies forthwith. Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Uniform Commercial Code in force in the State of Nevada. Any statutory lien for rent is not hereby waived, the security interest herein granted being in addition and supplementary thereto. Notwithstanding the foregoing, Landlord agrees that in the event of any asserted conflict between Landlord's statutoryand common law lien rights (or the rights granted by this Lease) and the perfected security interest lien rights of any third party lender providing financing to Tenant secured by Tenant's personal property and equipment, the said lender's lien shall prevail.

21. ***Miscellaneous Provisions***. The following provisions shall govern this Lease:

21.1 ***Rules and Regulations***. Tenant shall observe faithfully and comply strictly with such Rules and Regulations by this reference made apart hereof as Landlord may from time to time reasonably adopt for the safety, care, and cleanliness of the Building for the preservation of good order therein.

Landlord shall not be liable to the Tenant for violation of any such Rules and Regulations, or the breach of any covenant or condition in any lease by any other tenant in the building. (*SEE EXHIBIT D Rules & Regulations)

21.2 ***Right of Access***. Upon reasonable notice to Tenant (no less than 24 hours' notice in the case of a non-emergency), Landlord and its agents shall have free access to the Demised Premises during all reasonable hours for the purpose of examining the same to ascertain if they are in good repair, to make reasonable repairs which Landlord may be required to make hereunder, and to exhibit the same to prospective purchasers or tenants.

21.3 ***End of Term; Holding Over***. At the termination of this Lease, Tenant shall surrender the Premises to Landlord in as good condition and repair as reasonable, proper use thereof will permit and will leave the Premises broom-clean. If not then in default, Tenant shall have the right prior to said termination to remove any equipment, furniture, trade fixtures, or other personal property in the Premises by Tenant, provided that Tenant promptly repairs any damage to the Premises caused by such removal. In the event of holding over by Tenant after expiration of this Lease without Landlord's prior written consent, Tenant shall pay a sum equal to (150%) of the then current rent for the monthly installment of Rent which is in effect at the expiration of the Lease. Any holding over without the written consent of Landlord shall thereafter constitute a tenancy at sufferance.

21.4 ***Transfer of Landlord's Interest***. In the event of any transfer or transfers of Landlord's interest in the Premises or in the real property of which the Premises are a part, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer. The rights of Tenant under this Lease shall not be affected by any such transfer, however, any transfer of the Landlord's interest as described herein shall not be binding upon Tenant until Tenant receives a true copy of the documents transferring Landlord's interest in the Lease and assigning all liability to the transferee. Furthermore, Landlord shall provide the name, address, and any phone number the Landlord may have of the transferee.

21.5 ***Estoppel Certificate, Attornment, and Non-Disturbance***. Within ten (10) business days following the receipt of Landlord's written request Tenant shall deliver, executed and recordable form, a declaration to say any person designated by Landlord: (i) ratifying this Lease; (ii) stating the commencement and termination dates of the Lease; and (iii) certifying (a) that this Lease is in full force and effect and has not been assigned, modified, supplemented, or amended (except by such writing as shall be stated); (b) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any); (c) that no defenses, credits, or offsets against the

enforcement of this Lease by Landlord exist (or stating those claimed); (d) the sum of advance rent, if any, paid by Tenant; (e) the date to which rent has been paid; (f) the amount of security deposited with Landlord and such other information as Landlord reasonably requires. Persons receiving such statements shall be entitled to rely upon them. Tenant shall, in the event of a sale, transfer, or assign thereof) in the Premises, the Building, or this Lease, or if the Premises or Building comes to the hands of a mortgagee, ground Lessor, or any other person whether because of a mortgage or deed of trust foreclosure, exercise of a power of sale under a mortgage or deed of trust, termination of the ground lease, or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder, provided such purchaser, mortgagee, or the other person shall warrant and defend Tenant in the quiet enjoyment and possession of the Premises for the duration of the Term, subject to the terms and conditions of this Lease. Tenant shall execute, at Landlord's request, any reasonable attornment agreement required by any mortgagee or deed of trust holder, ground Lessor, or other such person to be executed, and containing such provisions as such mortgagee or deed of trust holder, ground Lessor, or other person requires. Except as otherwise stated herein, this Lease shall be subordinate and inferior at all times to the lien of any deed of trust or other method of financing or refinancing now or hereafter existing against all or part of the real property upon which the Building is located, and to all renewals, modifications, replacements, consolidations, and extensions thereof. Tenant shall execute and deliver all documents requested by any mortgagee or deed of trust holder or security holder to effect such subordination provided any such third party explicitly recognizes in writing Tenant's rights and privileges under this Lease. If Tenant fails to execute and deliver any such document requested by a mortgagee or deed of trust holder or security holder to effect such subordination, Landlord is hereby authorized to execute such documents and take such other reasonable steps as are necessary to effect such subordination on behalf of Tenant as Tenant's duly authorized irrevocable agent and attorney-in-fact, it being agreed that such power is one coupled within interest. Tenant's failure to execute and deliver such documents or instruments as provided in this Section within fourteen (14) days after the receipt by Tenant of a written request to do so shall constitute a default under this Lease.

21.6 *Notices*. Any notice required or permitted hereunder may be given by: (i) hand delivery and shall be deemed given on the date of delivery; (ii) registered or certified mail and shall be deemed given the third day following the date of mailing; or (iii) overnight delivery and shall be deemed given the following day.

All notices to Tenant shall be addressed to Tenant at the Building of which the Premises are apart.

All notices to Landlord shall be addressed to:

**Landlord:** **THE MNTN CHURCH**
**ATTN: SAMUEL GOULET**
**9501 Hillwood Drive**
**Las Vegas, NV 89134**

21.7 ***Attorney Fees***. In the event that suit is brought by either party against the other for a breach or default under the terms of this Lease, the prevailing party shall be entitled to reasonable attorney fees.

21.8 ***Payments***. All sums due hereunder for any reason shall be deemed to be rent or additional rent.

21.9 ***Time of Essence***. Time is of the essence with respect to the performance of every provision of this Lease.

21.10 ***Headings***. The captions contain in the Lease are for convenience only and shall not be considered in the construction or interpretation of any provision hereof.

21.11 ***Incorporation of Prior Agreements; Amendments***. This Lease contains all the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose. No provision of this Lease may be amended or added to except by any agreement in writing signed by the parties hereto or their respective successors in interest.

21.12 ***Waivers***. No waiver by Landlord of any provision of this Lease shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision. Landlord's consent to or approval of any subsequent act of Tenant, whether or not similar to the act so consented to or approved, shall not constitute a consent to or waiver of any other breach or default in the performance of any other obligation hereunder. No act or thing done by Landlord or Landlord's agents during the Term of the Lease shall be deemed in acceptance of a surrender of the Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord. The subsequent acceptance of Rent shall not be deemed a waiver of any preceding breach by Tenant of any term, covenant, or condition of the Lease, other than the failure of Tenant to pay the particular Rent so accepted.

21.13 ***Quiet Enjoyment***. Landlord shall warrant and defend Tenant in the quiet enjoyment and possession of the Premises throughout the Term, subject to the terms and conditions of the Lease.

21.14 ***Binding Effect.*** This Lease shall be binding upon, and inure to the benefit of the parties hereto, their heirs, successors, assigns, executers, and administrators.

21.15 ***Tenant Parking.*** Tenant shall receive FOUR (4) covered reserved parking spaces through the initial lease term at no charge. Additional covered reserved parking spaces are available to rent for $75.00 per month.

21.16 ***Non-Compete.*** N/A

21.17 ***Brokerage fees.*** N/A

21.18 ***Signage.*** Exterior building signs are subject to Landlord approval, if at all available. Any, all Tenant signage shall be at Tenant's sole cost and expense if building signage was ever approved by Landlord.

IN WITNESS WHEREOF, the parties have duly executed this Lease on the respective dates set forth below.

**TENANT:**
**ACTON ACADEMY RED ROCK, LLC**

______________________________

**Name:**

**Title:**

**Date:** ___________

**LANDLORD:**
**THE MNTN CHURCH, LLC**

______________________________

**Name:**

**Title:**

**Date:** ___________

**GUARENTY:**
**AMY NOVAK**

______________________________

**Name:**

**Title:**
**Date:** ___________

**LANDLORD:**
**PRECEDENT PROPERTIES, LLC**

______________________________

**Name:**

**Title:**
**Date:** ___________

## EXHIBIT A

**Suite #300 – Approximately +/- 7,667 RSF including shared open common space**

## EXHIBIT B

**TENANT SCOPE OF WORK DEMO & TENANT IMPROVEMENTS TO BE AS FOLLOWS:**

N/A

# EXHIBIT C

## **BASE RENT & CAMS PAYMENT SCHEDLUE**

| Month | Year | #100 Monthly Base Rent | Monthly CAMS | Monthly Total |
|---|---|---|---|---|
| 1 | Sep-25 | $ 10,197.11 | $ 2,656.05 | $ 12,853.16 |
| 2 | Oct-25 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 3 | Nov-25 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 4 | Dec-25 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 5 | Jan-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 6 | Feb-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 7 | Mar-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 8 | Apr-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 9 | May-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 10 | Jun-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 11 | Jul-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 12 | Aug-26 | $ 16,100.70 | $ 4,193.77 | $ 20,294.47 |
| 13 | Sep-26 | $ 16,583.72 | TBD | TBD |
| 14 | Oct-26 | $ 16,583.72 | TBD | TBD |
| 15 | Nov-26 | $ 16,583.72 | TBD | TBD |
| 16 | Dec-26 | $ 16,583.72 | TBD | TBD |
| 17 | Jan-27 | $ 16,583.72 | TBD | TBD |
| 18 | Feb-27 | $ 16,583.72 | TBD | TBD |
| 19 | Mar-27 | $ 16,583.72 | TBD | TBD |
| 20 | Apr-27 | $ 16,583.72 | TBD | TBD |

| | | | | |
|---|---|---|---|---|
| 21 | May-27 | $ 16,583.72 | TBD | TBD |
| 22 | Jun-27 | $ 16,583.72 | TBD | TBD |
| 23 | Jul-27 | $ 16,583.72 | TBD | TBD |
| 24 | Aug-27 | $ 16,583.72 | TBD | TBD |

**Year 3: $17,081.23 monthly Base Rent**

**Year 4: $17,593.67 monthly Base Rent**

**Year 5: $18,121.48 monthly Base Rent**

**EXHIBIT D**

**RULES AND REGULATIONS**

1. Tenant shall not suffer or permit the obstruction of any Common Areas inside & outside of the building including driveways, walkways, and stairways, lobby, hallways, bathrooms, stairwells..

2. Landlord reserves the right to refuse access to any persons Landlord in good faith judges to be a threat to the safety, reputation, or property of the Project and its occupants.

3. Tenant shall not make or permit any noise or odors that annoy or interfere with other Tenants or persons having business within the Project.

4. Tenant shall not keep animals or birds within the Project and shall not bring bicycles, motorcycles, or other vehicles into areas not designated as authorized for same.

5. Tenant shall not make, suffer, or permit litter except in appropriate receptacles for that purpose.

6. Intentionally Deleted. Tenant plans to re key interior office doors.

7. Tenant shall be responsible for the inappropriate use of any toilet rooms, plumbing, or other utilities. No foreign substances of any kind are to be inserted therein.

8. Tenant shall not deface the walls, partitions or other surfaces of the premises or Project.

9. Tenant shall not suffer or permit any thing in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Project.

10. Furniture, significant freight, and equipment shall be moved into or out of the Building only with the Landlord's knowledge and consent and subject to such reasonable limitations, techniques, and timing as may be designated by Landlord. Tenant shall be responsible for any damage to the Project arising from any such activity.

11. Tenant shall not employ any service or contractor for services or work to be performed in the Building except as approved by Landlord

12. Landlord reserves the right to close and lock the Building on Saturdays, Sundays, and legal holidays and on other days between the hours of 7:00 P.M. and 7:00 A.M. of the following day. If Tenant uses the Premises during such periods, Tenant shall be responsible for securely locking any doors it may have opened for entry.

13. Tenant shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14. No window coverings, shades or awnings shall be installed or used by Tenant other than Building standard window coverings approve in advance by Landlord.

15. No Tenant, employee, or invitee shall go upon the roof of the Building.

16. Smoking is not allowed in the Professional Center. Tenant shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in any area of the Premises or in the common areas of the Professional Center.

17. Tenant shall not use any method of heating or air conditioning other than the HVAC system originally installed on the Premises.

18. Tenant shall not install, maintain, or operate any vending machines upon the Premises without Landlord's written consent.

19. The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20. Tenant shall comply with all safety, fire protection, and evacuation regulations established by Landlord or any applicable governmental agency.

21. Landlord reserves the right to waive any one of these rules or regulations and/or as to any particular Tenant and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Tenant.

22. Tenant assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23. Landlord reserves the right to make such other reasonable rules and regulations as it may from lime to time deem necessary for the appropriate operation and safety of the Project and its occupants. Tenant agrees to abide by these and such rules and regulations.

**PARKING RULES**

1. Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."

2. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, or invitees to be loaded unloaded or parked in areas other than those designated by Landlord for such activities.

3. Parking stickers or identification devices shall be the property of Landlord and be returned to Landlord by the holder thereof upon termination of the holder's parking privileges. Tenant will pay such replacement charge as is reasonably established by Landlord for the loss of such devices.

4. Landlord reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules regulations laws and/or agreements.

5. Intentionally deleted.

6. Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

7. Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle. Landlord will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

8. Validation, if established, will be permissible only by such method or methods as Landlord and/or its licensee may establish at rates generally applicable to visitor parking.

9. The maintenance, washing, waxing, or cleaning of vehicles in the parking structure or Common Areas is only allowed in an area specified by Landlord.

10. Tenant shall be responsible for seeing that all of its employees, agents, and invitees comply with the applicable parking rules, regulations, laws and agreements.

11. Landlord reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

12. Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

13. Landlord expressly reserves the right to reserve and/or designate parking spaces for the exclusive use of any tenant or tenants, or officers or employees thereof which Landlord may specify; and Landlord further reserves the right to charge such tenants (separate from and in addition to rent) Landlord's current rate for reserved parking. Landlord may at any time close any common area to make repairs or changes, to prevent the acquisition of public rights in such areas, or to discourage non-customer parking. Landlord may do such other acts in and to the common areas as in its judgment may be desirable, and Landlord shall have the right to diminish the common areas and to dedicate portions of the common areas for utility purposes. Tenant shall, upon request, furnish to Landlord the license number of cars operated by Tenant and its employees. Tenant hereby agrees to pay Landlord, upon written demand, the sum of Twenty-Five Dollars ($25.00) per car per day for each car of Tenant, or any of its employees, agents or contractors, which is parked in any area of the Flamingo Center reserved for another tenant, or otherwise other than the area designated by Landlord. Tenant shall not at any time interfere with the right of the Landlord, other tenants, its and their agents, employees, servants, contractors, subtenants, licensees, customers and business invitees to use any part of the parking lot or other common areas. Landlord shall under no circumstances be liable for any reduction of the common areas, and no such reduction shall terminate or modify this Lease or Tenant's obligations hereunder. Landlord assumes no responsibility to police the use of said parking areas and Landlord shall not be liable for the use thereof by Landlord, Landlord's other tenants, its or their agents, employees, servants, contractors, subtenants, licensees, customers and/or business invitees or by any other person or persons, entity or entities whomsoever.

# EXHIBIT 2

Corey B. Beck
Nevada Bar No. 5870
LAW OFFICE OF COREY B. BECK P.C.
425 South Sixth Street
Las Vegas, Nevada 89101
Telephone: (702) 678-1999
Email: becklegal@yahoo.com
*Attorneys for Debtor, Acton Academy Red Rock LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>ACTON ACADEMY RED ROCK LLC,<br><br>Debtor. | Case No.: 26-13991-mkn<br>Chapter: 11<br><br>**DECLARATION OF AMY NOVAK IN SUPPORT OF DEBTOR'S MOTION TO EXTEND THE TIME WITHIN WHICH TO ASSUME OR REJECT AN UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(d)(4)**<br><br>Hearing Date: [__________]<br>Hearing Time: [__________] |

I, Amy Novak declare as follows:

1. I am the Principal and Operator of Acton Academy Red Rock LLC, the debtor and debtor in possession in this Chapter 11 case (the "Debtor"). I am authorized to make this Declaration on the Debtor's behalf.

2. I make this Declaration in support of the Debtor's Motion to Extend the Time Within Which to Assume or Reject an Unexpired Lease of Nonresidential Real Property (the "Motion"). Unless otherwise stated, the facts set forth below are based on my personal knowledge, my review of the Debtor's books and records kept in the ordinary course of business, and my discussions with the Debtor's counsel. If called as a witness, I could and would testify competently to these facts. Capitalized terms not defined herein have the meanings given in the Motion.

3. The Debtor filed its voluntary petition under Chapter 11 on June 26, 2026. The Debtor continues to operate its business as a debtor in possession. The Debtor operates a

private school that currently has 58 students in 4multi-age studios. in the Red Rock area of Las Vegas, Nevada from the premises described below.

4. The Debtor is the lessee under the Lease dated September 11, 2025 for the Premises located at 9501 Hillwood Drive, Las Vegas, NV 89134. The lessor is [The MTN Church and Precedent Properties, LLC (the "Landlord").

5. I tendered July payment on August 7, 2026 in amount of $15,000.00.

6. I tendered August payment on August 12, 2026 in the amount of $17,200.00.

7. I tendered September payment on September 4, 2026 in the amount of $ 15,250.80.

8. In addition, Objection to Claim is important and necessary in regard to decision to assume or reject lease. I will have more information as to amount of funds and tendering of payment soon. I am learning how many students will be enrolling for next year. I will be able to project income from students enrolling for the next school year.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 30, 2026, at Las Vegas, Nevada.

Amy Novak
Principal and Operator of Acton Academy Red Rock LLC